**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **RAMIRO MARTINEZ** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 08-4224** |
| **OFFSHORE SPECIALTY FABRICATORS, INC.** | * | **SECTION "L"(3)** |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

**I.      PROCEDURAL HISTORY**

This is a civil action brought by the Plaintiff, Ramiro Martinez, pursuant to the Jones Act and general maritime law against his employer, Defendant Offshore Specialty Fabricators, Inc. The Plaintiff seeks damages for personal injuries allegedly sustained while he was employed as a mechanic aboard the D/B WILLIAM KALLOP, an offshore derrick barge.  The Plaintiff alleges that on May 26, 2008, while the vessel was in navigable waters, he was sent to repair a winch on board the M/V MR. GILBERT, a tug also owned by the Defendant that was supporting the WILLIAM KALLOP.  The Plaintiff alleges that on the MR. GILBERT he used several sledgehammers including a homemade sledgehammer, consisting of a sledgehammer head welded to a metal pipe, to hammer a rusted and frozen pin into the winch.  He contends that using a sledgehammer in the cramped conditions on the MR. GILBERT caused severe and permanent injuries to his spine and other portions of his body.

Defendant Offshore admits that Plaintiff sustained an injury while in the course of duty and has therefore paid Plaintiff's maintenance and cure.  But Offshore denies that the injury was a result of an accident caused by its negligence or any unseaworthy condition on board the MR.

1

GILBERT.  Offshore contends that Plaintiff did not report a specific injury related to using the sledgehammer after the purported accident, that Plaintiff's account of his work on the MR. GILBERT is inaccurate, and that Plaintiff's theory of the case has evolved in response to the evidence.

This case came on for trial to the Court without a jury on March 14, 2011.  The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into evidence during the trial, as well as the record.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as a conclusion of law, the Court hereby adopts them as such.  To the extent that any conclusions of law constitute a finding of fact, the Court adopts them as such.

## II.      FINDINGS OF FACT

1.      Plaintiff, Ramiro Martinez, is an adult resident of Laguna Vista, Texas.  He was born on July 16, 1947 and was sixty at the time of his injury and sixty-three at the time of trial. He has an eighth-grade education and speaks English as his second language.

2.      Defendant, Offshore Specialty Fabricators, Inc. (now Offshore Specialty Fabricators, LLC) is a Louisiana corporation with its principal place of business in Houma, Louisiana.

3.      Plaintiff began employment with Offshore Specialty Fabricators, Inc. as a mechanic in March, 2007.  His earnings before 2007 were as follows: $7,675 in 2002; $6,200 in 2003; $2,803 in 2004; $3,681 in 2005; and $8,009 in 2006.  In 2007, the Plaintiff earned $48,315.  While employed with the Defendant, he earned $17 per hour and time and a half for overtime, and was working a 40 hour week for 28 days on and 14 days off.

4.      In May of 2008, Plaintiff was working as a member of the crew of the derrick barge

WILLIAM KALLOP, a vessel owned and operated by his Employer, Offshore Specialty

Fabricators, Inc.

5.      On May 26, 2008, while at a job site in the Gulf of Mexico more than three miles off the

coast of Louisiana, the Plaintiff, Thomas Smith, the leaderman, and Jamie Gray, a

welder, were instructed by the foreman to go aboard the M/V MR. GILBERT (a tug that

was also owned by Offshore and was providing support to the derrick barge WILLIAM

KALLOP) to repair the tug's stern winch.

6.      The problem with the winch was that a pin or shaft on the winch had shifted or moved

out of position and was frozen due to heavy rust and corrosion, causing the braking

system of the winch to malfunction and be inoperable to retrieve the anchors of the

derrick barge, WILLIAM KALLOP.

7.      The accumulation of rust was obviously not a sudden occurrence but one that had been

allowed to develop as a result of poor maintenance or oversight by the vessel's crew

before the vessel was ever dispatched to the offshore job site.

8.      Repairing of the frozen pin or shaft on the M/V MR. GILBERT required that the heavy

accumulation of rust first be removed and the pin pushed or moved back into position.

9.      It was the Defendant's company policy to prepare a Job Safety Analysis report before

beginning any work.  That was not done in this case, although there is evidence to

indicate that the employees discussed the nature of the problem and their method of work

before beginning the job in question.  There is also evidence to suggest that the

employees signed a blank Job Safety Analysis form before beginning the job, and that the

form was completed after the work was finished.

10.     To repair the winch, the Plaintiff's supervisor, the leaderman Thomas Smith, devised the

following repair methodology: the welder, Jamie Gray would first use his welding torch to heat the pin "red hot," after which Smith or the Plaintiff would douse the red-hot metal with cold water.  Then either Smith or the Plaintiff would immediately bash the winch pin with a sledgehammer as hard and as rapidly as they could from six to fifteen times to dislodge the rust and force the pin back into position.  This procedure would then be repeated again with Smith and the Plaintiff alternating as the one using the sledgehammer each time.

11.     The substantial weight of the testimony establishes that the winch was located in a position on the stern of the vessel that provided a cramped, limited space for the Plaintiff to swing the sledgehammer.  Additionally, because the winch pin was located approximately one foot off the deck of the MR. GILBERT and because there was a cover protruding from the top of the winch at chest height, the Plaintiff was required to bend and crouch in order to see the pin and swing the hammer at it.  The cramped work conditions and the contorted body position that the sledgehammer work required put an undue amount of stress on the neck and upper torso of the Plaintiff.

12.     At some point during the heating/dousing/bashing procedure, the Plaintiff felt a pain in his neck.  The Plaintiff's supervisor saw what he described as the Plaintiff's body "twitch," at which point he told the Plaintiff to stop working while the remaining employees completed the job.

13.     There is some evidence to suggest that one of the sledgehammers the Plaintiff used was a makeshift sledgehammer consisting of a pipe welded to a sledgehammer head which, when used caused vibrations and increased the stress on the Plaintiff's body versus a regular hammer, as demonstrated by a bend in the pipe handle which developed during

use.  There is a dispute in the testimony as to whether the Plaintiff's injury manifested itself while he was using that makeshift sledgehammer, or a traditional wooden-handled sledgehammer.  However, there is no dispute that the Plaintiff's injury manifested itself while he was swinging a sledgehammer in the cramped conditions while bent at the waist as described above.

14.    There is some dispute as to how the winch pin was eventually repaired.  The Plaintiff's supervisor, leaderman Thomas Smith, testified that a hydraulic jack was never used and that the work was completed by using the sledgehammers.  But the Plaintiff testified in detail how a second, smaller hydraulic jack was used after his injury and demonstrated how the jack was positioned with respect to the pin by identifying in a picture of the winch the specific notch or point at which the jack was mounted.  Accordingly, the weight of the credible evidence establishes that the pin was eventually moved back into position and the winch repaired through use of a hydraulic jack which was used after the Plaintiff was injured and which could have been used before his injury.

15.    Shortly after his injury, the Plaintiff went to Doug Mauro, a medic on board the WILLIAM KALLOP, where he complained of soreness due to using a hammer.  The Plaintiff was given muscle rub.

16.    On May 28, 2008, the Plaintiff went to Ray Pesson, a medic on board the WILLIAM KALLOP, complaining of neck and jaw pain.  The Plaintiff received muscle relaxant pills and requested to see a doctor.

17.    The Plaintiff did not work again on the WILLIAM KALLOP after his injury.  The Plaintiff's roommate on the WILLIAM KALLOP was Thomas Smith, who testified that after his injuries the Plaintiff complained of pain, could not eat, and had difficulty turning

his head.  The Plaintiff has not worked since May 26, 2008.

18.    On June 6, 2008, the Plaintiff was first evaluated by Dr. Madhavan Pisharodi, a board-certified neurosurgeon.  Over three additional visits, Dr. Pisharodi conducted a cervical MRI, identified stenosis, or narrowing, of the spinal canal at the C3-4 and C4-5 vertebrae, and diagnosed the Plaintiff with cervical radiculopathy and prescribed physical therapy.  The physical therapy relieved some of the pain but did not completely alleviate it.  Dr. Pisharodi testified that he had no reason to believe the symptoms did not start after the Plaintiff's workplace accident.

19.    Plaintiff later sought medical attention from Dr. Zoran Cupic, a board-certified orthopedic surgeon.  Dr. Cupic X-rayed the Plaintiff and reviewed his file and on October 8, 2008, diagnosed Plaintiff with cervical strain and degenerative disc disease from C3 to C6 and protrusions or herniations from C3 to C6.  Dr. Cupic prescribed anti-inflammatory and pain medications.  The Plaintiff visited Dr. Cupic again on November 17, 2008, at which time his symptoms were about the same.  Dr. Cupic ordered a discogram, which was performed on March 16, 2009, which identified the discs at C3-C4 and C4-C5 as the cause of Plaintiff's symptoms, with the possibility of additional symptoms caused by C5-C6.  At future visits, Dr. Cupic recommended a C3-C4 and C4-C5 fusion surgery.  Dr. Cupic concluded as of November 17, 2008, that the Plaintiff was unable to return to work, and that the symptoms were the result of the May 26, 2008 accident.

20.    The Plaintiff later sought treatment from Dr. John Masciale, a board-certified orthopedic surgeon.  Dr. Masciale first saw the Plaintiff on January 19th, 2009, at which point the Plaintiff complained of episodes of incapacitating pain in his neck and left shoulder area.

Dr. Masciale reviewed the Plaintiff's medical history and records and examined him, and concluded that the Plaintiff was experiencing radiculopathy at the third, fourth, and fifth levels of his spine.  Dr. Masciale also ordered a cervical MRI to confirm that the Plaintiff was a candidate for surgery.  He also concluded that the Plaintiff's symptoms were causally related to the May 26, 2008 incident.

21.     Plaintiff underwent a three-level cervical fusion surgery (C3-4, C4-5, and C5-6) on July 19, 2010.  Dr. Masciale opines that Plaintiff will be at maximum medical improvement by July, 2011 and that no further medical treatment is anticipated after that.  He opines that Plaintiff will have permanent restrictions on repetitive bending, stooping, lifting, and carrying, but that he will be able to undertake light-to-medium work.  The above-described medical treatment has been paid for by the Defendant.

22.     At the request of the Plaintiff, Dr. G. Randolph Rice, Ph.D., has prepared an estimate of the Plaintiff's loss of past and future wages.  He estimates that the Plaintiff has lost $127,646.00 in past wages and will lose $170,236.00 in future wages, for a total of $297,882.00.  This estimate is based on a post-trial work-life expectancy of 3.30 years and a calculation of Plaintiff's annual income of $62,640.95.  Dr. Rice based this income on the Plaintiff's base rate of pay at the time of his accident of $17.00 per hour, a 28-day-on, 14-day-off work schedule, and a typical work week of 40 regular hours, 44 overtime hours, with time-and-a-half for overtime.  The opinion also reflects the fact that the Plaintiff was 60 years old when he was injured and is expected to work an additional 3.3 years during his remaining lifetime.  It does not appear to assume that the Plaintiff will obtain future employment at minimum wage.

23.     At the request of the Plaintiff, Nathaniel Fentress performed a vocational rehabilitation

evaluation of the Plaintiff.  Mr. Fentress produced a report dated June 18, 2010, and an

addendum dated December 16, 2010.  Mr. Fentress's ultimate conclusion is that post-

surgery, the Plaintiff's "wage earning capacity on reaching maximum medical

improvement remains assessed from a total loss of wage earning capacity in significant

substantial gainful employment upwards to his ability to earn the approximate minimum

wage in alternate gainful employment."  Mr. Fentress opines that if the Plaintiff

accomplishes a good recovery, he could return to entry-level service economy

employment, such as a security guard, small engine mechanic, or light duty delivery

driver.

24.   At the request of the Defendant, Dr. Kenneth J. Boudreaux, Ph.D, has prepared an

estimate of the Plaintiff's loss of past and future wages.  Dr. Boudreaux has based his

calculation on four possible annual income amounts: 1) $12,737.42 per year, based on

Plaintiff's average income between 2002 and 2007; 2) $28,162.00, based on Plaintiff's

average income from 2006 through 2007; 3) $48,315.00, the highest annual income

earned by Plaintiff in any year; and 4) $62,469.27, the annual income Plaintiff would

earn working on a 28-on, 14-off schedule at $17.00 per hour.  Dr. Boudreaux calculates

four figures for past lost wages from the time of the accident through trial based on those

four possible incomes, as well as four ranges of future lost wages based on permanent

disability, 50% capacity, and future work at minimum wage.  The opinions reflect the

fact that the Plaintiff was 60 years old when he was injured and is expected to work an

additional 2.2 years during his remaining lifetime.  The Court finds that in light of the

Plaintiff's earning history, it is appropriate to use $48,315.00 as the annual income tax

base for calculating the Plaintiff's lost wages.  That figure represents the highest annual

income earned by the Plaintiff in any one year, and was the third basis used by Dr.

Boudreaux.

25.     Based on the opinions of Dr. Boudreaux and Mr. Fentress regarding the Plaintiff's past

and future earning capacity, the Court finds it appropriate to use Dr. Boudreaux's

calculation of the Plaintiff's past and future loss of wages based on the annual income tax

base of $48,315.00, and the Plaintiff's future ability to obtain minimum wage work.

Thus, the Court finds that Plaintiff's past wage loss is $100,205.77, and Plaintiff's future

wage loss is $60,000.00.  The future wage loss figure is increased slightly from Dr.

Boudreaux's figure to reflect the time that Plaintiff would need to recuperate before

returning to employment.

## III.     CONCLUSIONS OF LAW

### A. Jurisdiction

1.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1333,

which confers on the federal district courts original jurisdiction over admiralty and

maritime claims.  Venue is proper because the Court has personal jurisdiction over

Offshore.  *See* 28 U.S.C. § 1391(b), (c).

### B. Jones Act Negligence

2.      Under the Jones Act, an employer has the duty to "provide his seaman employees with a

reasonably safe place to work."  *Simmons v. Transocean Offshore Deepwater Drilling,*

*Inc.*, 551 F. Supp. 2d 471, 475 (E.D. La. 2008) (citing *Colburn v. Bunge Towing, Inc.*,

883 F.2d 372, 374 (5th Cir. 1989)).  An employer breaches that duty if it fails to exercise

ordinary prudence and is thereby negligent.  *Gautreaux v. Scurlock Marine, Inc.*, 107

F.3d 331, 338, 339 (5th Cir. 1997) (en banc).  In other words, an employer breaches its

9

duty if it disregards a danger that it "'knew or should have known.'"  *Colburn*, 883 F.2d

at 374 (quoting *Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 619 (E.D. La. 1988)).

Under the Jones Act, the negligence of a fellow employee is imputed to the employer.

*See Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991) (noting that this leads to "a

broad basis for liability"); *see also De Zon v. Am. President Lines, Ltd.*, 318 U.S. 660,

664-65 (1943).

3.   Requiring a Jones Act seaman to work in "awkward and confined quarters without

adequate help and without suitable tools and equipment" can be negligence under the

Jones Act.  *Crador v. La. Dep't of Highways*, 625 F.2d 1227, 1230 (1980).

4.   The weight of the evidence establishes that Defendant Offshore was negligent in

requiring the Plaintiff to swing a sledgehammer in cramped conditions that required him

to crouch and bend forward in a manner that increased the risk of injury to his neck and

upper torso.  The weight of the evidence establishes that a reasonable alternative tool, the

hydraulic jack, was available and was in fact used to complete the task.

5.   Apart from negligence, a plaintiff seeking relief under the Jones Act must show

causation. "A seaman is entitled to recovery under the Jones Act if his employer's

negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335.

The Fifth Circuit has observed that this is a "liberal causation requirement," *Brister*, 946

F.2d at 354, one that places a "'featherweight'" burden on the plaintiff, *Landry v. Two R.

Drilling Co.*, 511 F.2d 138, 142 (5th Cir. 1975) (quoting Grant Gilmore & Charles Black,

The Law of Admiralty § 6-36 (1957)). Indeed, "[i]f the defendant's negligence played

any part, however small, in producing the seaman's injury, it results in liability." *Brister*,

946 F.2d at 354; *accord Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62

(5th Cir. 1982) ("Defendant must bear responsibility if his negligence played any part, even the slightest, in producing the injury.").

6.      Offshore's negligence in requiring the Plaintiff to use a sledgehammer in cramped conditions contributed to his injuries.  The weight of the testimony establishes that using a sledgehammer to repair the winch pin in the cramped conditions on the MR. GILBERT increased the risk of injury to the Plaintiff.  Further, the weight of the testimony establishes that the Plaintiff did not have pain or other symptoms of injury to his spine until he used a sledgehammer on the MR. GILBERT on May 26, 2008.

**C. Unseaworthiness**

7.      "To establish a claim of unseaworthiness, 'the injured seaman must prove that the [vessel] owner has failed to provide a vessel . . . which is reasonably fit and safe for the purposes for which it is to be used.'" *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)).  "A vessel's condition of unseaworthiness might arise from any number of circumstances." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971).  For instance, a vessel may have an unfit crew. *Id.*; *accord Bonmarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189-191 (5th Cir. 1991).  A vessel may also be unseaworthy because of "an unsafe method of work." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354-55 (5th Cir. 1988); *accord Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992) (noting that "an unsafe method of work may also render a vessel unseaworthy").  An injured seaman must show something more than an "'isolated, personal negligent act'" in order to establish that a vessel was unseaworthy, however. *Lambert v. Diamond M Drilling Co.*, 688 F.2d 1023, 1024 (5th Cir. 1982) (quoting *Usner*, 400 U.S. at 500).

11

8.     The M/V MR. GILBERT was unseaworthy on May 26, 2008.  As noted above, the winch

       pin was rusted and corroded, and obviously must have been in that condition for some

       time.  The winch pin was positioned such that any repair work on it had to occur in

       cramped, unsafe conditions that made injury more probable.  Collectively, these

       circumstances created an unsafe work condition on the MR. GILBERT

9.     A plaintiff raising a claim of unseaworthiness "must establish a causal connection

       between his injury and the breach of duty that rendered the vessel unseaworthy."

       *Jackson*, 245 F.3d at 527.  "There is a more demanding standard of causation in an

       unseaworthiness claim than in a Jones Act negligence claim."  *Johnson*, 845 F.2d at

       1354. "[The] plaintiff must prove that the unseaworthy condition played a substantial part

       in bringing about or actually causing the injury and that the injury was either a direct

       result or a reasonably probable consequence of the unseaworthiness."  *Id.*

10.    The fact that the winch had been allowed to become so rusted and corroded that it

       required repair in cramped and confined conditions played a substantial part in causing

       the Plaintiff's injury, because the corrosion of the inaccessible part necessitated the

       unsafe repair work that injured Plaintiff.

**D. Contributory Negligence**

11.    Like an employer, a seaman is "obligated under the Jones Act to act with ordinary

       prudence under the circumstances."  *Gautreaux*, 107 F.3d at 339. A seaman's

       "contributory negligence does not bar recovery" under the Act. *Gavagan v. United*

       *States*, 955 F.2d 1016, 1019 (5th Cir. 1992).  Instead, it is "an affirmative defense that

       diminishes recovery in proportion to the seaman's fault."  *Johnson v. Cenac Towing, Inc.*,

       544 F.3d 296, 302 (5th Cir. 2008).  Similarly, a seaman's contributory negligence does

not preclude recovery under a claim of unseaworthiness, but rather bars recovery "for the damages sustained as a result of his own fault." *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989), *aff'd*, 498 U.S. 19 (1990); *see also Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir. 1982).

12.     In this case, the Plaintiff was contributorily negligent.  In light of his extensive experience working aboard boats and as a mechanic, the Plaintiff knew or should have known that using a sledgehammer in cramped conditions such as those aboard the M/V MR. GILBERT could increase the risk of injury.  The Plaintiff also knew or should have known that Offshore had a "work-stop" program through which the Plaintiff could have immediately stopped work on the frozen winch pin until a safer method could be determined.  *See Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 372 (5th Cir. 1982) (noting that "where a seaman has the possibility of securing relief from unsafe conditions by informing his superiors of them, but continues to work doing so, he may be found to be contributorily negligent").  The Court concludes that the Plaintiff is 20% at fault for his injury.

13.     Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present, and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from injury caused by the employer's negligence and the unseaworthiness of the vessel. Schoenbaum, *supra*, §§ 5-15, 6-18; *see also Sosa v. M/V Lagbo Izabal*, 736 F.2d 1028, 1034-35 (5th Cir. 1984). In light of the credible evidence, the Plaintiff has sustained the following damages:

      a. Past wages:                    $100,205.77

      b. Future wages:              $60,000.00

       c. Past pain and suffering:    $80,000.00

       d. Future pain and suffering:  $50,000.00

14.     In light of the Plaintiff's contributory negligence, he may recover the following amounts:

       a. Past wages:           $80,164.62

       b. Future wages:        $48,000.00

       c. Past pain and suffering:    $64,000.00

       d. Future pain and suffering:  $40,000.00

## E. Maintenance and Cure

15.     "Maintenance and cure is an obligation imposed upon a shipowner to provide for a seaman who becomes ill or injured during his service to the ship." *Boudreaux*, 280 F.3d at 468.  This obligation "does not depend on any determination of fault, but rather is treated as an implied term of any contract for maritime employment." *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006).  "[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seamen." *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n.2 (5th Cir. 1981).  As noted above, the parties have stipulated that the Plaintiff is a seaman, and the evidence shows that he was injured on May 26, 2008 while working onboard the MR. GILBERT. Accordingly, the Plaintiff is entitled to maintenance and cure.

16.     The parties have filed a joint stipulation that all maintenance has been paid and all prior medical payments owed as cure have been paid or are in the process of being paid. Further, maintenance and cure payments are continuing because the Plaintiff is not expected to reach maximum medical cure until July, 2011.  Accordingly, no maintenance is due at this time.

**F. Pre-Judgment Interest**

17.     "'[I]n maritime cases the award of prejudgment interest is the rule, rather than the

exception, and the trial court has discretion to deny prejudgment interest only where

peculiar circumstances would make such an award inequitable.'" *In re Signal Int'l, LLC*,

579 F.3d 478, 500 (5th Cir. 2009) (quoting *Corpus Christi Oil & Gas Co. v. Zapata Gulf*

*Marine Corp.*, 71 F.3d 198, 204 (5th Cir. 1995).  "The essential rationale for awarding

prejudgment interest is to ensure that an injured party is fully compensated for its loss."

*City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995).

"[P]rejudgment  interest is not awarded as a penalty; it is merely an element of just

compensation."  *Id.* at 197.  Prejudgment interest is appropriate in cases of mutual fault.

*Id.* at 199.  If awarded, "the date of injury, rather than the date of judicial demand" is "the

proper date from which prejudgment interest should run."  *Sea Link Cargo Svcs. Inc. v.*

*Marine Centre Inc.*, 380 F. App'x 460, 464 (5th Cir. 2010).  The rate of prejudgment

interest is discretionary with the court.  *See Marathon Pipe Line Co., v. M/V Sea Level II*,

806 F.2d 585, 593 (5th Cir. 1986).  Given the facts of the instant case, the Court finds

that it is appropriate to award prejudgment interest on Plaintiff's past wage loss and past

pain and suffering, at the judicial rate from May 26, 2008, the date of the accident.

IV.     **SUMMARY**

        The Court finds that Defendant was 80% at fault and the Plaintiff was 20% at fault for the

Plaintiff's injury and the damages should be apportioned in these percentages.  Accordingly,

Plaintiff is entitled to recover $232,164.62 from Defendant for the following losses:

            a. Past wages:               $80,164.62

            b. Future wages:             $48,000.00

          c. Past pain and suffering:     $64,000.00

          d. Future pain and suffering:  $40,000.00

The Plaintiff is also entitled to pre-judgment interest on the amounts for past wage loss and past

pain and suffering from the date of the accident, May 26, 2008, to the date of entry of judgment,

and post-judgment interest on the amount of the judgment and pre-judgment interest, from the

date of judgment until paid.

     New Orleans, Louisiana, this 19th day of April, 2011.


                                                **UNITED STATES DISTRICT JUDGE**